UNITED STATES *v.* JACKSON ET AL.

No. 57. Argued December 5, 1929. Decided January 6, 1930.

4 s186

*Assistant Attorney General Richardson,* with whom *Solicitor General Hughes* and *Mr. Pedro Capo-Rodriguez* were on the brief, for the United States.

No appearance for Jackson et al.

Opinion of the Court, by MR. CHIEF JUSTICE TAFT, announced by MR. JUSTICE VAN DEVANTER.

The statute under which the Indian, Jack Williams, secured his trust patent to the land here involved was

that of July 4, 1884, c. 180, 23 Stat. 96, the pertinent part of § 1 of which is printed in the margin.[1]  Its purpose and effect were to extend to the Indian wards of the United States, subject, however, to the direction of the Secretary of the Interior, the privileges then enjoyed by citizens of the United States under the federal homestead laws.  It was provided that patents issued to Indians for homestead lands under the Act should, however, recite that the United States holds the land in trust for the sole use and benefit of the Indian for a period of twenty-five years, and that at the expiration of such period the United States would convey the same by final patent to the Indian or his widow and heirs in fee and discharged of the trust.  The trust patent here issued to Williams conformed to these requirements of the law.

The first question certified to us by the Circuit Court of Appeals is whether, after an Indian had acquired a trust patent under the provisions of this statute, power remained in the Congress to extend, or to provide that the Executive, in his discretion, might extend, before its expiration and before there had come to be issued to the Indian a patent in fee, the period of the trust with its

---

[1] " That such Indians as may now be located on public lands, or as may, under the direction of the Secretary of the Interior, or otherwise, hereafter, so locate may avail themselves of the provisions of the homestead laws as fully and to the same extent as may now be done by citizens of the United States; . . . but no fees or commissions shall be charged on account of said entries or proofs.  All patents therefor shall be of the legal effect, and declare that the United States does and will hold the land thus entered for the period of twenty-five years, in trust for the sole use and benefit of the Indian by whom such entry shall have been made, or, in case of his decease, of his widow and heirs according to the laws of the State or Territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his widow and heirs as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever."

resulting restrictions on alienation. We do not think that our decisions leave any doubt not only that it is' within the power but that it is the duty of the Congress, where it finds conditions which warrant it, so to do. We have had frequent occasion to point out the duty of the United States to protect its wards, the Indians, and the conse-quent broad extent of its power over them and their affairs. *United States* v. *Kagama,* 118 U. S. 375, 384; *United States* v. *Nice,* 241 U. S. 591, 597. There is noth-ing in the Act of 1884 which indicates any disposition on the part of the United States to dispossess itself of its powers and duties as guardian, or so to change the status of its wards as to leave them no longer subject to man-ifestations of its protection. On the contrary the provi-sions of the Act leave no doubt that it is an act done by the United States in its capacity as guardian, and that the rights conferred by the Act upon the Indians were so con-ferred principally because they were wards of the Gov-ernment. This is shown by the provisions exempting In-dians from the payment of the usual fees, and by the provision respecting the form of the trust patent, and the restrictions on alienation.

This being so, we fail to find anything in the Act of June 21, 1906, which transcends the valid powers of the Government over its wards. Passing, for the moment, the question whether the Act of 1906 was intended to apply to Indian homesteaders claiming under the Act of 1884, and assuming, for the purposes of question No. 1, that the word " allottee " was intended to include such Indians, we find that the Act provides:

" That prior to the expiration of the trust period of any Indian allottee to whom a trust or other patent containing restrictions upon alienation has been or shall be issued under any law or treaty the President may in his dis-cretion continue such restrictions on alienation for such period as he may deem best. . ."

This does not involve any question of an attempt to destroy vested rights. The power of the United States, delegated by the Act to the President, is to be exercised prior to the issuance of final patent. It has been held that until final patent be issued no vested right is obtained by the Indian which would support a constitutional objection to the enlargement of the period of the restriction. See *United States* v. *Allen*, 179 Fed. 13, 22, 23; *United States* v. *Hemmer*, 195 Fed. 790.

What has here occurred is that the United States has conferred a privilege upon its wards—as such—and has surrounded its final acquisition with restrictions calculated to secure the advantage of the privilege to those intended to be benefited. Finding that the restrictions authorized at the time of the extension of the privilege will not, in all cases, be long continued enough to secure this result, Congress has authorized the Executive, in his discretion, to continue the restrictions for such period as he may deem best. That this is within the constitutional power of Congress must be considered as concluded by our decisions in *Tiger* v. *Western Investment Co.*, 221 U. S. 286; *Heckman* v. *United States*, 224 U. S. 413; and *Brader* v. *James*, 246 U. S. 88.

The first question must be answered in the affirmative.

But it is suggested, and the District Court has held, that since the language of the Act of June 21, 1906, refers only to Indian *allottees,* it cannot be considered as authorizing the President to continue restrictions on alienation in patents issued to Indian *homesteaders* under the Act of July 4, 1884. In ruling that the 1906 Act did not apply to the trust patent issued to Williams, since he was not an allottee but an Indian homesteader, claiming by virtue of the 1884 Act, which extended the benefits of the homestead laws to the Indians, and not under the General Allotment Act of 1887 or any of its amendments, the District Court relied upon *Seaples* v. *Card,* 246 Fed.

501.   In that case a homestead patent was issued to a non-tribal Indian under the Act of July 4, 1884, and, as required by that Act, the patent declared—as does the one here—that the United States held the title in trust for the Indian for a period of 25 years, and would then issue him or his heirs a patent in fee.   Before the expiration of this trust period, the Land Department, assuming to act either under the Allotment Act of 1887, or the Act of May 8, 1906, c. 2348, 34 Stat. 182, amendatory thereof, canceled the original trust patent and issued a new patent giving the Indian title in fee simple.   The Act of May 8, 1906, provided that the Secretary of the Interior might, in his discretion, whenever he should be satisfied that any " Indian allottee " was competent and capable of managing his or her affairs, cause to be issued to such allottee a patent in fee simple, and the District Court held in that case that this statute gave no authority to the Secretary to cancel the patent issued to Seaples under the 1884 Act, which extended the benefit of the homestead laws to the Indians, but that the 1906 Act applied only to " Indian allottees."

Into the correctness of this decision we do not inquire. It is not, however, controlling here since it turned upon the interpretation of the Act of May 8, 1906, and did not involve any question concerning proper construction of the Act of June 21 of that year, which is presently involved.

Our inquiry is whether Congress intended to include within the meaning of the word " allottees " as used in the latter Act, Indian wards of the United States holding homestead lands by virtue of the Act of 1884.   It is argued that Congress did so intend, but that the legislators used only the term " allottee " and did not add " or Indian homesteader " because, while such addition would have prevented the question here involved from arising, it would have added further confusion for the reason that

the language is too broad and would include as well as tribal Indians claiming as wards of the United States under the Act of 1884, Indians claiming as citizens—not as Indian wards—under the general homestead laws. The purpose of the language used is therefore not so plainly apparent as to preclude resort to judicial interpretation. On the contrary, if effect is to be given to the true intent of the Congress, we must avail ourselves of sources of information other than the language of the Act in order to aid us in the disclosure of that intention. There is here no lack of familiar and approved sources from which light upon the proper construction of this statute may be obtained.

It is a familiar rule of statutory construction that great weight is properly to be given to the construction consistently given to a statute by the Executive Department charged with its administration. *United States* v. *Cerecedo Hermanos y Compañia,* 209 U. S. 337; *Robertson* v. *Downing,* 127 U. S. 607; *United States* v. *Healey,* 160 U. S. 136; and such construction is not to be overturned unless clearly wrong, or unless a different construction is plainly required. *United States* v. *Johnston,* 124 U. S. 236, 253; *Hawley* v. *Diller,* 178 U. S. 476, 488. Applying this rule, we find from the case of *Toss Weaxta,* 47 L. D. 574, that it has long been the settled ruling of the Department of the Interior, both under the very statutes here involved and under other statutes enacted by Congress with similar purpose and pursuant to its general plan with respect to Indian allotments and homesteads, that Indian allotments and Indian homesteads are in all essential respects upon the same footing, and that each is equally within the purview of a statute in which the Congress may use only the terms " allottee " and " allotment."

The case of *Toss Weaxta, supra,* was in all essential respects identical with this case, and it involved the same question of law under the same two statutes. Weaxta had

received a trust patent under the Act of 1884, and, at the expiration of the 25-year trust period, he applied to the Commissioner of the General Land Office to issue to him a patent in fee covering his homestead. The Commissioner denied the application, on the ground that the trust period had been, by order of the President, extended, pursuant to the power given the President by the Act of June 21, 1906. Weaxta appealed to the Secretary of the Interior, claiming that an Indian homestead, such as he held, was not an Indian allotment, and that the Act of June 21, 1906, by its terms limits the authority to extend the trust periods to " Indian allotments only." The First Assistant Secretary, in affirming the decision of the Commissioner, found:

" The Department all along has considered Indian homesteads and Indian allotments upon the public lands as being upon practically the same footing, and Congress has recognized the similarity."

He concluded, from a review of laws *in pari materia*, the condition and standing of the Indians, and the obligations of the Government, that both Indian homesteads and Indian allotments must be considered as included within the meaning of the Act of June 21, 1906.

In the case of *Jim Crow,* 32 L. D. 657, 659, the question was whether lands inherited from a deceased Indian *homesteader* came within the provisions of the Act of May 27, 1902, 32 Stat. 245, 275, which Act, by its terms, authorized the sale and conveyance of inherited Indian lands by the heirs of a deceased *allottee.* The Assistant Attorney General held that the Act applied to the heirs of *all* Indian claimants for portions of the public lands, to whom a trust or other patent containing restrictions upon alienation had been issued, regardless of whether the claim of the Indian was initiated under what are known as Indian homestead laws or under Indian allotment laws. This ruling was approved by the Acting Secretary of the Interior, 32 L. D. p. 659. In that ruling the similarity of

the claims of Indians arising out of rights conferred upon them by the General Allotment Act and by the Act of 1884 which gave them homestead entry rights, was pointed out. It was there said:

" The general allotment act, so far as it affects public lands, and the preceding Indian homestead provisions, are so clearly connected that they should be construed *in pari materia* as relating to the same subject-matter. The later allotment act but carries forward the policy of the former enactments to give Indians a right to secure homes upon the public domain.

" Congress has recognized that allotment claims are of the same nature as homestead rights. A fund has been provided for assisting Indian homesteaders and carried upon the books of the Treasury Department under the title ' Homesteads for Indians,' and by the Act of March 3, 1891, 26 Stat. 989, 1007, the Secretary of the Interior was authorized and directed to apply the balance of this fund for the employment of allotting agents ' to assist Indians desiring to take homesteads under section 4,' of the act of February 28 [8], 1887.

" Here Congress characterized claims under the allotment act as homesteads. Claims under the various laws relating to Indian homesteads may with equal propriety be characterized as allotments. In fact the terms mean substantially the same thing so far as the laws in which they are found affect the public lands and so far as the interests of the Indian claimant are concerned.

" This Department has considered Indian homesteads upon practically the same footing as Indian allotments upon the public lands. It is held that the Government is bound to protect the rights of the Indian homesteader during the trust period, that no preference right of entry is obtained by contest against an Indian homestead and a relinquishment of an Indian homestead entry does not become effective until approved by this Department.

(*Doc Jim,* 32 L. D. 291). These rules apply also to Indian allotments. The control, jurisdiction, and obligations of the Department are the same in one case as in the other.

" The objects of the law relating to Indian homesteads are the same as those relating to Indian allotments on the public-lands, the status of the Indian claimant is the same under both classes of laws, the duties and obligations of the government are the same. Both the legislative and executive branches of the government have recognized these similarities of purpose in the laws, standing of claimants thereunder, and obligations of the government."

The ruling of the Department of the Interior has been to the same effect under the Act of June 25, 1910, 36 Stat. 855. It was held that that Act empowered the Secretary to determine the heirs of an Indian to whom a homestead trust patent had been issued under the Act of 1884, when the Indian dies before the expiration of the trust, notwithstanding that the Act provides only " that when any Indian to whom an *allotment* of land has been made, or may hereafter be made, dies before the expiration of the trust period," the Secretary may determine his heirs. *Toss Weaxta,* 47 L. D. at 577.

We find that the Indian Homestead Act of July 4, 1884, and the General Allotment Act of February 8, 1887, with its various amendments, constitute part of a single system evidencing a continuous purpose on the part of the Congress. The statutes are *in pari materia,* and must be so construed. It cannot be supposed that Congress, in any part of this legislation, all of which is directed toward the benefit and protection of the Indians, as such, intended to exclude from the beneficent policy which each Act evidences, an Indian claiming under the homestead act, even though the statute uses the term " allottee." If there were any doubt on the question, the silence of Congress in the face of the long continued practice of the

Department of the Interior in construing statutes which refer only to Indian "allottees," or Indian "allotments," as applicable also to Indians claiming under the homestead laws, must be considered as "equivalent to consent to continue the practice until the power was revoked by some subsequent action by Congress." *United States* v. *Midwest Oil Co.,* 236 U. S. 459, 481.

Nothing herein contained must be taken as intimating that the Act of June 21, 1906, has any application to the acquisition of homestead rights under the general homestead laws by persons of the Indian race who have acquired or seek to acquire such rights as citizens rather than as Indian wards of the United States. This distinction is pointed out in *Case of Frank Bergeron,* 30 L. D. 375.

*Both questions answered, "Yes."*